ESTATE of Norah K. LLOYD

v.

The UNITED STATES.

No. 367–79T.

United States Court of Claims.

June 3, 1981.

Christopher H. Little, Providence, R. I., attorney of record, for plaintiff.

Edmund C. Bennett, II, Margaret D. Farrell and Tillinghast, Collins & Graham, Providence, R. I., of counsel.

William B. Barker, with whom was Acting Asst. Atty. Gen. John F. Murray, Washington, D.C., for defendant.

Theodore D. Peyser, Jr., and Donald H. Olson, Washington, D.C., of counsel.

Before DAVIS, NICHOLS, and BENNETT, Judges.

## ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

DAVIS, Judge:

The Estate of Norah K. Lloyd (Estate) challenges the Internal Revenue Service's denial to it of a tax credit under section 2013 of the Internal Revenue Code of 1954, 26 U.S.C. § 2013. That provision grants a full or partial credit for estate taxes paid with respect to the transfer of property to a decedent-transferee from a transferor who died within 10 years before or 2 years after the decedent's death. The issue here is whether a life estate previously willed (in 1970) to Norah K. Lloyd (who died in 1975) was capable of being valued under section 2013. Both sides have moved for summary judgment. Though we make definitive legal rulings, we deny both motions and remand for further proceedings.

## I

Norah K. Lloyd was the wife of Henry D. Lloyd. He died testate in 1970, and provided for his wife through two testamentary trusts—the Family Trust and the Marital Trust. Mrs. Lloyd and a trust company were co-trustees of both trusts.

It is the Family Trust with which we are directly concerned. The income from that trust which was initially valued at over $440,000 was to be paid, with minor exceptions, to Mrs. Lloyd during her lifetime. After her death, the income was to be paid to the Lloyds' two daughters and, upon the death of each daughter, one-half of the principal was to pass to the issue of that daughter. The will gave the corporate trustee the authority to pay sums from the principal of the Family Trust to Mrs. Lloyd or any of Mr. Lloyd's issue whenever the trustee, in "its sole and uncontrolled discretion may deem necessary or advisable * *." The same paragraph went on to list a number of illustrative purposes for which invasion would be appropriate. It also declared that the principal of the Family Trust was not to be invaded on Mrs. Lloyd's behalf until the Marital Trust principal was exhausted. The will allowed the trustee, when exercising its discretionary power to invade, to consider other resources of the persons for whom the trust principal could be invaded, to the extent it deemed it "wise and proper" to do so.

In addition to her interest in the Family Trust, Mrs. Lloyd was also the beneficiary of the Marital Trust. Under the terms of that trust, which was initially valued at over $600,000, she was to receive all of the trust income for life, and was also granted a general testamentary power of appointment over the trust corpus. The corporate trustee was given the authority, "for any reason, [to] pay to [Mrs. Lloyd], out of the principal of the trust estate of the Marital Trust, such sum or sums as the corporate trustee, in its uncontrolled discretion, may deem necessary or advisable."

At the time of Mr. Lloyd's death, he left his wife, two daughters, and seven grandchildren. It is undisputed on these motions that his wife was, at that time and until her death five years later in 1975, a person of substantial means. She owned her own home, and in addition to the income she received under the Family and Marital Trusts, she also became the settlor of a revocable trust with a value at her death of over $570,000. Both of the Lloyd's daughters also had substantial family incomes from other trusts and from their spouses' incomes.

After Mrs. Lloyd's death, her estate filed a claim for a section 2013 credit for estate taxes paid by her husband's estate with respect to the transfer of the life interest which she received in the Family Trust. *See* note 2, *infra.* The IRS denied the

credit, apparently on the ground that, in view of the trustee's broad power to invade the corpus of that trust, it was impossible to value Mrs. Lloyd's life estate. After the additional taxes were paid, and a claim for refund filed, the Service denied the refund claim. The Estate then began this suit. The parties' cross-motions for summary judgment are diametrically opposed—plaintiff seeking the full actuarial value of Mrs. Lloyd's life interest and defendant urging that no section 2013 credit should be allowed at all.

## II

Section 2013(a) provides that

[t]he tax imposed by section 2001 [federal estate tax] shall be credited with all or a part of the amount of the Federal estate tax paid with respect to the transfer of property * * * to the decedent by or from a person (herein designated as a "transferor") who died within 10 years before, or within two years after, the decedent's death.[1]

The provision's purpose was "to prevent the diminution of an estate by the imposition of successive taxes on the same property within a brief period * * *." H.R.Rep. No. 1337, 83d Cong. 2d Sess. 90, *reprinted in* [1954] U.S.Code Cong. & Ad.News 4017, 4116; S.Rep. No. 1622, 83d Cong. 2d Sess. 463, *reprinted in* [1954] U.S.Code Cong. & Ad.News 4621, 4755. Under section 2013(d), "[t]he value of property transferred to the decedent shall be the value used for the purpose of determining the Federal estate tax liability of the estate of the transferor * * *." Section 2013 property covers "any beneficial interest in property," 26 U.S.C. § 2013(e),[2] including life estates, remainders and other limited interests. 26 C.F.R. § 20.2013–4(a). Treasury Regulation 20.2013–4 deals with the valuation of property transferred to the decedent. That value is defined as

the value at which the property was included in the transferor's gross estate for the purpose of the Federal estate tax (see sections 2031, 2032, 2103, and 2107, and the regulations thereunder) reduced as indicated in paragraph (b) of this section. If the decedent received a life estate or remainder or other limited interests in property included in the transferor's gross estate, *the value of the interest is determined as of the date of the transferor's death on the basis of recognized valuation principles* (see especially §§ 20.-2031–7 and 20.2031–10 [actuarial tables for valuing life estates]) (emphasis added)).

Defendant takes the position that this statutory and regulatory scheme requires section 2013 valuation to be based solely on the facts and circumstances known or reasonably predictable at the time of the transferor's death. Plaintiff would have us rather adopt a "hindsight" or "wait-and-see" approach, incorporating reliance on certain factors which became known only after Mr. Lloyd's (the section 2013 transferor) death, such as whether the corpus of the Family Trust was actually invaded during Mrs. Lloyd's lifetime.

 We agree that the Government's "look forward" method is the only acceptable one. The value of property for section 2013 is to be the value used in determining the federal estate tax liability of the transferor (as reduced by certain other factors not relevant here). 26 U.S.C. § 2013(d). *See also,* 26 C.F.R. § 20.2013–4(a). That value is determined at the time of that decedent's death. 26 U.S.C. § 2031(a). Treasury Regulation 20.2013–4(a) provides that the value of life estates and other limited interests are to be determined "*as of the date the transferor's death * * *.*" (emphasis added). The legislative history of section 2013 is in harmony with this time

---

1. How much credit the estate receives for taxes paid on prior transfers depends on a number of factors. *See* 26 U.S.C. § 2013 and implementing regulations at 26 C.F.R. §§ 20.2013 *et seq.*

2. Credits based on the prior testamentary transfer of a life estate are allowable even though such a life interest is not includable in the decedent's gross estate. Rev.Rul. 59–9, 1959–1 C.B. 232; *Holbrook v. United States,* 575 F.2d 1288, 1290 (9th Cir. 1978).

of valuation, *see* S.Rep.No. 1622, 83d Cong. 2d Sess. 463 *reprinted in* [1954] U.S.Code Cong. & Ad.News 4621, 4755–56, which has consistently been followed by the IRS. *See,* Rev.Rul. 70–292, 1970–1 C.B. 187, 188; Rev. Rul. 67–53, 1967–1 C.B. 265, 266. This has been the way life estates have been valued for over fifty years for federal estate tax purposes, at least whenever Congress has indicated, as here, that their value is to be set as of the decedent's death. *Ithaca Trust Co. v. United States,* 279 U.S. 151, 154–55, 49 S.Ct. 291, 292, 73 L.Ed. 647 (1929).

In the face of this strong support for "looking forward," plaintiff relies on *Estate of Chesterton v. United States,* 213 Ct.Cl. 345, 551 F.2d 278, *cert. denied,* 434 U.S. 835, 98 S.Ct. 123, 54 L.Ed.2d 96 (1977), for a "wait-and-see" approach. That case, which allowed a deduction from the estate tax of only those post-death support payments actually made under what is now section 2053 of the Code, is quite different. Section 2053 includes no requirement for a date-of-death valuation while section 2013 and its regulations clearly do impose such a mandate. Moreover, the *Chesterton* court pointed out that Congress probably treated post-death support payments as in the same category as funeral and administrative expenses which normally arise after death. That of course is not true of section 2013 which looks squarely to valuation at the time of the transferor's death. Also, we cannot avoid a comment on plaintiff's inconsistency. The Estate would have us look at some facts as of the time of Mrs. Lloyd's death (*e. g.* that the principal was not in fact invaded), but to ignore other circumstances then known (*e. g.,* that she lived only 5 years after Mr. Lloyd rather than her 17 year estimated life expectancy under 26 C.F.R. § 20.2031–7). If the "wait-and-see" method were to be fully followed, we very much doubt that plaintiff would indorse it.

### III

■ Regulation 20.2013–4 requires that value be determined "on the basis of recog-

nized valuation principles," but it does not define those principles, other than to refer to regulations containing actuarial tables for determining life estate values. Section 2013 itself is no more specific. It is implicit, however, in the statute and the regulations that a life estate or other property for which credit is sought under section 2013 must be rationally capable of valuation at the transferor's death. This is a principle of valuation long followed in comparable estate tax situations, *Humes v. United States,* 276 U.S. 487, 48 S.Ct. 347, 72 L.Ed. 667 (1928); *Ithaca Trust Co., supra,* 279 U.S. at 154, 49 S.Ct. at 291; *Merchants Bank v. Commissioner,* 320 U.S. 256, 261, 64 S.Ct. 108, 111, 88 L.Ed. 35 (1943), and we think that it clearly applies to section 2013 as well. *See Holbrook v. United States,* 575 F.2d 1288, 1292 (9th Cir. 1978); *American Nat'l Bank and Trust Co. of Chattanooga v. United States,* 31 A.F.T.R.2d 1363 (E.D. Tenn.1972); Rev.Rul. 67–53 1967–1 C.B. 265, 266.

The next step for this case is to refine that standard for life estates as to which the corpus can be invaded. On that problem, defendant urges that we refer to the decisions under a former version of 26 U.S.C. § 2055 (estate tax deductions for a charitable remainder after a life estate).[3] Before its amendment in 1969 (which obviated the need for these rules), section 2055 (and its regulation) authorized an estate tax deduction for the value of a charitable remainder, but the deduction was limited by interpretation to the extent the remainder's value was "presently ascertainable." In a leading case in this area, the Supreme Court described the standard under section 2055 for the allowance of a deduction of the value of a charitable remainder:

> Only where the conditions on which the extent of invasion of the corpus depends are fixed by reference to some *readily ascertainable and reliably predictable facts* do the amount which will be diverted from the charity and the present value of the bequest become adequately mea-

---

3. This mode has been followed by the Ninth Circuit and by IRS in revenue rulings. *Holbrook, supra,* 575 F.2d at 1291, Rev.Rul. 70–292, 1970–1 C.B. 187, 188.

surable. And, in these cases, the taxpayer has the burden of establishing that the amounts will either be spent by the private beneficiary or reach the charity are thus *accurately calculable*. [*Merchants Bank, supra*, 320 U.S. at 261, 64 S.Ct. at 111. (emphasis added).]

The Court went on (as it had earlier) to require that the invasion of the corpus for the life beneficiary be circumscribed so that the value of the life estate, and reciprocally that of the charitable remainder, could be properly calculated under the "ascertainable" standard. *See also Ithaca Trust Co., supra*, 279 U.S. at 154, 49 S.Ct. at 291 (extent of invasion of corpus for life beneficiary held to be "fixed in fact and capable of being stated in definite terms of money"); *Henslee v. Union Planters Bank*, 335 U.S. 595, 598–600, 69 S.Ct. 290, 291–293, 93 L.Ed. 259 (1949) (extent of possible invasion of corpus not ascertainable and therefore charitable deduction not allowable).[4]

The Supreme Court's lead under the then section 2055 was followed by a large number of lower court decisions (for a general survey, *see Salisbury v. United States*, 377 F.2d 700, 703–06 (2d Cir. 1967)) which made very fine distinctions depending on the particular phrasing of the purposes for which the will allowed invasion of the corpus for the life beneficiary's purposes. Some judges and commentators decried these subtle distinctions as hair-splitting and unrealistic, *see Blodget v. Delaney*, 201 F.2d 589, 594–95 (1st Cir. 1953) (Magruder, C. J., concurring); *Seubert v. Shaughnessy*, 233 F.2d 134, 138 (2d Cir. 1956) (Clark, C. J.); *see also, Salisbury, supra*, 377 F.2d at 706 n.10, and as we have said the 1969 Congress ended the need for this process under section 2055 by changing the provisions for charitable deductions.

A good deal could be said for wholly abandoning with respect to section 2013 the "presently ascertainable" formula previously used under section 2055, and for relying instead solely on the realistic probabilities of actual invasion of the corpus at the time of the testator's death. *See, e. g., Blodget, supra*, 201 F.2d at 595 (Magruder, C. J., concurring); *Seubert, supra*, 233 F.2d at 138. But we are reluctant to do so in this case because the IRS and a Court of Appeals have decided to follow the decisions under section 2055 (*see* note 3, *supra*)[5] and because we think that, assuming that the tests are basically equivalent for the two sections, the terms of Mr. Lloyd's will, as interpreted in the light of Rhode Island law (the domiciliary state), combine to create a standard under which Mrs. Lloyd's life interest was both susceptible of determination "on the basis of recognized valuation principles" under section 2013 and its regulations, and sufficiently ascertainable and calculable to meet, at the minimum, the requirements applicable to the old section 2055 cases. *See* Part IV, *infra*.

Nevertheless, in applying the former 2055 decisions to section 2013 it is to be remembered that for the present class of case there is a difference. Under section 2055, in order to value the charitable remainder, the court looked to see whether a trustee could invade the corpus for a previous life beneficiary without an ascertainable standard limiting that invasion. What had to be found before a charitable deduction was allowed was a ceiling beyond which the corpus could not be invaded for the benefit of the life beneficiary—*i. e.*, the maximum amount of invasion for the life interest. In section 2013, on the other hand, the interest to be valued is the life estate itself, and to show measurability the "ascertainable standard" need necessarily go no further than to establish the minimum amount of trust principal which is safe from invasion for others (and the concomitant life income created by that

---

4. Under this controlling criterion, the extrinsic facts at the testator's death which would show the likelihood or remoteness of corpus invasion were irrelevant to whether the charitable interest was "presently ascertainable." *Salisbury v. United States*, 377 F.2d 700, 703 n.5 (2d Cir. 1967). That was simply decided from the terms and intent of the will. *See* note 12, *infra*.

5. When section 2013 was first adopted in 1954, the "ascertainable" rule under section 2055 was in full force.

amount of principal). In this case, for instance, we need consider at this point only whether Mr. Lloyd intended that the trust principal not be invaded for others beyond a certain point, so that there would always be money available for his wife's benefit from the Family Trust, and her life interest would indisputably have some value.[6]

## IV

Under section 2055, a tax benefit was generally allowed where "the trustee's powers are so circumscribed *either by the trust instrument or state law* that the value of the interest in question is 'accurately calculable.'" *Holbrook, supra,* 575 F.2d at 1291. (emphasis added.) State law is highly persuasive in will construction because of the state's power over the trustee's invasion of corpus. *Salisbury, supra,* 377 F.2d at 707.

Rhode Island law governs the interpretation of Mr. Lloyd's will since it was his domicile. The settled law of that state is that

> the intent of the testator must be ascertained if possible from the language of the will * * * as a whole. In discovering that intent, the words used are to be given their primary, ordinary and common meaning, unless it plainly appears that they are used in another sense. * * That intent, when ascertained, is to be given effect unless contrary to law. [*Lees v. Howarth,* 85 R.I. 321, 131 A.2d 229, 230–31 (1957).]

*Accord, Industrial Nat'l Bank of R.I. v. Rhode Island Hospital,* 99 R.I. 289, 207 A.2d 286, 291 (1965).

Under that standard, the dispositive provisions of Mr. Lloyd's will clearly evidence to us that his primary concern was for the welfare of his surviving widow. He provided that, in addition to receiving all of his tangible personal property, Will, ¶ 4, she would receive the entire net income of both the Family and Marital Trusts during her lifetime. Since these two trusts comprised almost the whole of his estate, the fact that she was the sole beneficiary of their income is proof of his great desire to see to her well-being. Moreover, principal of the Marital Trust could be paid to Mrs. Lloyd "for any reason," and in "such sum or sums as the corporate trustee, in its uncontrolled discretion, may deem necessary or advisable." Will, ¶ 10(a). Over and above these sources of funds, Mr. Lloyd provided that, if the principal of the Marital Trust were ever exhausted, his wife could receive payments out of Family Trust principal.

We infer from the combination of these provisions that Mr. Lloyd's foremost concern in his will was insuring that after his death his wife would be able to maintain a standard of living appropriate to her station in life.[7] We are convinced that this purpose was implicit in his estate plan as a whole, and served as a curb on the Trustee's power to invade the corpus of the Family Trust, set forth in paragraph 10(b) of the will.

Paragraph 10(b) provided that

> (b) The Trustees may at any time and from time to time pay to my said wife and my issue, or any one or more of them exclusive of the other or others, *out of the principal of the Family Trust, such sum or sums as the corporate Trustee in its sole and uncontrolled discretion may deem necessary or advisable * * *.* Without restricting the discretion of the corporate trustee as to paying principal of the trust estate of the Family Trust,

---

**6.** *See* note 12, *infra.*

**7.** That standard encompasses more than simply the provision of money sufficient to maintain Mrs. Lloyd in her prior mode of life. Rather, it includes such sums of money as would be necessary to allow her to live as others in the same financial bracket as she and her husband would normally live. Thus even though Mrs. Lloyd may have lived very modestly, and below the standard accepted as average for her "class", before Mr. Lloyd's death, there is no indication in the terms of his will that he expected or desired that her lifestyle would be so restricted when he was no longer alive. For instance, if Mrs. Lloyd had not travelled in the past (although travel was common among her financial equals) and she decided she would like to do so after her husband's death, such expenses would appropriately comprise part of those to be considered in maintaining her in a way appropriate to her station in life.

and only by way of illustration, principal may be paid for the care, maintenance, support, education or advancement, or to meet any emergency in the health of or the expense of the last illness and funeral, or otherwise for the benefit, comfort, convenience or welfare, of any person then or prospectively entitled to receive income from said trust, or any of the issue of, or any member of the immediate family of any such person or issue, or to make up any deficiency in income or in purchasing power caused by currency or credit inflation or by changes in the cost of living. [(emphasis added).]

The Government contends that this creates a power of invasion, especially for others, so broad and all-inclusive that it renders the life interest in the Family Trust incapable of valuation and not calculable under the "ascertainable" standard. We must disagree.

Although a literal reading of parts of paragraph 10(b), taken out of context and without consideration of the limitations placed on the trustee's discretionary powers by Rhode Island law and by the will as a whole, might support the defendant's position, we cannot look at the Trustee's invasion authority in that isolated way. Instead, the testator's intent as to the extent of the invasion power must be determined by looking at the will as a whole, *Metcalf v. Gladding*, 35 R.I. 395, 87 A. 195, 197 (1913), and "the key words of an instrument must be interpreted in light of their context." *Salisbury, supra*, 377 F.2d at 706.

The invasion power is limited in the will to situations where it is deemed by the trustee to be "necessary or advisable." By way of example, the will lists a number of situations which the testator believed might warrant exercise of this power. Defendant would focus on the power's potential breadth and literal all-inclusiveness, as well as on the will's directive that it is exercisable by the corporate Trustee whenever it, "*in its sole and uncontrolled discretion* may deem necessary or advisable." (emphasis added). But, as we have emphasized, to look at this language alone would be to ignore the testator's basic intent shown by other aspects of the will and the entirety of the instrument. To interpret the words absolutely, and thus find the power limitless "would destroy the purpose of the trust and frustrate the settlor's plan of disposition. * * * [I]n such circumstances [courts] have confined [the power's] exercise by fixed standards." *Industrial Bank, supra*, 207 A.2d at 290. In other words, a major purpose of the trust would be destroyed, and Mr. Lloyd's estate plan frustrated, if the corpus of the Family Trust were invaded for others to such an extent that it—taken together with other sources of income (*see* Will, ¶ 10(c))—was *not* sufficient to support Mrs. Lloyd appropriately to her life station.

Even where a power is termed "uncontrolled" or "absolute," these words are not necessarily interpreted literally by the Rhode Island courts. Rather,

"[i]n such a case the mere fact that the trustee has acted beyond the bounds of a reasonable judgment is not a sufficient ground for interposition by the court, so long as the trustee acts in a state of mind in which it was contemplated by the settlor that he would act. But *the court will interfere if the trustee acts in a state of mind not contemplated by the settlor. Thus the trustee will not be permitted to act dishonestly, or from some motive other than the accomplishment of the purposes of the trust, or ordinarily to act arbitrarily without an exercise of his judgment.*" [*Industrial Bank, supra*, 207 A.2d at 290, (citing from Restatement (Second) of Trusts § 187, subsec. 13j (1959)) (emphasis added).]

*See also, Viall v. Rhode Island Hospital Trust Co.*, 45 R.I. 432, 123 A. 570, 572 (1924); *Angell v. Angell*, 28 R.I. 592, 68 A. 583, 586 (1908). That principle of Rhode Island law would govern here to compel the Trustee to preserve at least so much of the trust corpus as was necessary to provide fully for Mrs. Lloyd during her life—that being Mr. Lloyd's primary intent.

The same is true as to the will's declaration that the Trustee could invade corpus in such measure as it considered "necessary or

advisable." Those words, as we have suggested, take on meaning from the testator's dominant purpose [8] and indicate that there should be no invasion which would so deplete the corpus that the income would be insufficient for proper maintenance of Mrs. Lloyd.

Similarly for the will's prescription that the

> corporate trustee may take into consideration all other available resources of any of [those for whom the trust corpus could be invaded] to such extent, and only to such extent, as it may deem wise and proper. [Will, ¶ 10(c).]

This language is phrased in precatory fashion and relies on the Trustee's view of "wise and proper" action, but the Trustee's discretion must always be exercised in accord with Rhode Island fiduciary law and with the will's overriding purpose. In this instance, the beneficiaries apparently all had substantial income from other sources, and the Trustee's power to invade the Family Trust would have to take into account those outside founts of income. *Cf., Peckham v. Newton*, 15 R.I. 321, 4 A. 758, 760 (1886).[9]

Defendant would discard the Rhode Island decisions because they did not involve a power to invade corpus, but we think the general principles they announce were meant to control trustees generally, not merely in the direct circumstances of that specific case. In particular, *Industrial Bank, supra*, is very close. Those parties asked the court to determine whether, under Rhode Island law, a trustee's power to allocate receipts and disbursements, expenses, and loss to either income or principal, made the value of the charitable remainder nonascertainable under section 2055. The decision how to allocate was left to the trustees "according to their judgment of what is right and proper under the circumstances, (without being bound by any court decision as to any other trust instrument) * * *." 207 A.2d at 289. While this power does not go to the invasion of principal, its effect is quite analogous since it allows the trustees to control, under very broad discretion, the flow of money in and out of principal and income. The state court looked at the overall testamentary scheme to discern the testator's intent, and found, as we do here, that the language if literally interpreted would frustrate the testator's intent, and that therefore the trustees' powers should be limited by fixed standards. 207 A.2d at 290. Although the standards applied in *Industrial Bank* are, of course, not fully applicable to this case (different powers being involved), that case is important in that it gives guidance as to how the Rhode Island courts will view the grants of very broad powers in this general area.[10]

Defendant also contends that Rhode Island law will uphold the grant of an absolute power. *See Lees, supra*, 131 A.2d at 231; *Metcalf, supra*, 87 A. at 197. In both of those cases, however, the court said that absolute or arbitrary powers were not favored, and only where it was clear from the will that the testator really intended to confer such a power, would it be recognized as such.[11] That, as we have stressed, is not true here.

8. In *Industrial Bank, supra*, the Rhode Island Supreme Court found that where exercise of the trustees' power was limited to what was "right and proper," it was "clear that the decedent did not intend that in all events their discretion should be unlimited." 207 A.2d at 291.

9. With respect to invasions of the Family Trust for the benefit of the wife, it is clearly "wise and proper" that the trustee would consider whether, if the principal were invaded currently, there would remain sufficient principal to produce income necessary to provide for Mrs. Lloyd's needs in the future (considering her other sources of income).

10. A section 2055 problem was directly involved in *Industrial Bank*, and the state court found an ascertainable standard. Defendant urges that the 2055 standards should be used for section 2013 and on that view *Industrial Bank* is obviously significant for the present case.

11. In *Metcalf*, the court found that, looking at the will as a whole, the testator had clearly intended to give his wife an absolute power to make advancements to their children. 87 A. at 198. In *Lees*, the parties agreed that an absolute power to invade the corpus had been granted, and the court found that that was in

The only relevant court decision under section 2013 is *Holbrook v. United States,* 575 F.2d 1288 (9th Cir. 1978). That case concerned the valuation for section 2013 of a life income interest created by a trust which authorized the trustees to invest in unproductive assets, to retain investments for speculative appreciation purposes, and to convert the estate to cash or securities producing little or no income, for as long as they deemed advisable. *Id.* at 1289–90. The Government contended, and the Ninth Circuit agreed, that such powers rendered the decedent's life income interest under the trust incapable of valuation as of the transferor's death, and hence ineligible for a tax credit under section 2013. *Id.* at 1290. Those plaintiffs conceded that the trust instrument did not provide a standard for valuation, and instead relied on Arizona law to place limits on the trustees' powers. *Id.* at 1291. The *Holbrook* court, applying the testator's intent as called for by Arizona law, held:

> To imply from this provision [making the decedent a life beneficiary of the trust income] that the trustees were under an absolute duty to produce income for the life income beneficiaries is to ignore the general plan of the instrument, which * * [was] intended to vest the trustees with broad discretion so that they could flexibly manage the trust fund in order to produce a great deal of, or very little, income. * * * [I]t cannot be said that a decision by the trustees to invest in assets producing little or no income would constitute a remediable abuse of discretion under Arizona law. [*Id.* at 1291–91.]

*Holbrook* is plainly very different from this case. That instrument expressly contemplated that the trustees could act so as to obtain and pay no income at all for the life

fact the testator's intent, subject to the requirement that the trustees act in good faith. 131 A.2d at 230–231.

12. In the section 2055 cases, once an ascertainable standard was found the courts looked to "the remoteness of invasion, or the extent of possible invasion, in terms of the standard, to determine the likelihood that the charity will take and the value of [its interest]." *See New-ton Trust Co. v. Comm'r,* 160 F.2d 175, 178–79

estate, and the court found that this was the testator's intent. To the same general effect, *see* Rev.Rul. 67–53, 1967–1 C.B. 265, 266.

### V

The end-result for this case is that Mrs. Lloyd's life interest in the Family Trust was sufficiently ascertainable at the time of Mr. Lloyd's death to avoid being held not to be calculable under section 2013. The Trial Division will have to determine the value of her interest (taking the standard we have prescribed as the minimum available to her) and also the amount of tax credit allowable to the estate.[12]

Both motions for summary judgment are denied and the case is remanded to the Trial Division for further proceedings under this opinion.

NICHOLS, Judge, concurring and dissenting:

I agree with and join in the first two sections of the court's opinion, but regret to say I cannot go along with the third, fourth, and fifth. I originally wished to deny both motions and remand, but the opinion suffers the fate of so many of mine, of convincing in a negative sense. I now think the remand would be futile and self-defeating and that the court's analysis of Henry D. Lloyd's intent is unsound. This analysis postulates that he in his will preferred the financial well being and security of Norah K. Lloyd above all other considerations. On this hypothesis the court reasons that the Rhode Island courts would enforce a floor below which they would not allow the assets in the Family Trust to be reduced, that the quantum of this figure can be determined, and that Norah K. Lloyd's life estate can be appraised from it.

(1st Cir. 1947); *Salisbury, supra,* 377 F.2d at 708. It was also held that the extrinsic facts (*e. g.* financial circumstances) at the testator's death are relevant to the remoteness of invasion (though irrelevant to the existence of an "ascertainable standard"). *Salisbury, supra,* 377 F.2d at 703 n.5 (*see* note 4, *supra*). *See also* Rev.Rul. 70–292, 1970–1 C.B. 187, 188 (similar position for section 2013).

It is evident the will of Henry D. Lloyd gave her both more and less than a pure life estate in the Family Trust assets. More, because the trustees could invade the corpus on her behalf if necessary in their opinion. Less, because they could also do the same for the "issue" of the Lloyd marriage, and their "issue" and members of their immediate family. Thus the class of contingent beneficiaries started out large, with the two daughters and their children, and would continually grow as members of the original class acquired spouses and issue. It appears to include persons who would on no contingency receive income, but the idea probably was that possible emergencies for the issue would include catastrophes °to their spouses. The power to invade the corpus I regard as primarily catastrophe insurance since at the time of the testator's death he had no reason to expect any of the objects of his bounty would need to have the corpus invaded on their behalf. We know that catastrophes occur at random and by definition are unforeseeable. If foreseen, they are averted. Thus, antecedently considered, the likelihood of the corpus being invaded *for* Norah K. Lloyd and *against* her would vary in the proportion the number of one person, Norah K. Lloyd, would bear to a large and growing number of remainder beneficiaries. Moreover, the trustees were not to invade the corpus of the Family Trust for Norah K. Lloyd until the martial trust was exhausted. This is clearly intended to protect the remainder beneficiaries and itself belies the idea that the financial welfare of Norah K. Lloyd was the only overriding consideration. Moreover, the catastrophes provided against include inflation and changes in the cost of living.

Suppose the husband of granddaughter X is kidnapped and held for ransom. Suppose at that time the income of Norah K. Lloyd is more than adequate for her needs but it is impossible to be sure that, with inflation, it will remain so. Are the trustees supposed to refuse to contribute to the ransom fund and let the husband be killed? Suppose a beneficiary is a doctor or lawyer and suffers a crushing malpractice verdict.

Will the trustees let him or her be bankrupted?

It appears to me that what conscientious trustees would do would be to balance the intensity of the crisis against the likelihood of future financial embarrassment to Mrs. Lloyd, in a decision they would make as informed and reasoned as possible. They would probably ask themselves what Henry D. Lloyd would have done if alive. I fail to see how, in deciding, they could bind themselves by any arbitrary line as to the quantum of corpus necessary to protect Mrs. Lloyd in the future.

Thus I do not find the trustee's power limitless, but I do contemplate situations where even a cautious and responsible trustee might feel compelled to take action that would result in a remaining corpus insufficient to protect Mrs. Lloyd in all possible contingencies. Thus the will did not create any part or portion of the Family Trust corpus that was wholly immune from invasion.

I note further that the court really will not value the entire life estate by recognized valuation principles, as the regulation prescribes. It will arbitrarily by guesswork set aside a portion of it and value that, the supposed uninvadeable portion. It does not appear that any such half a loaf effectuation of a tax credit is in accordance with the policies and practices of the IRS and of the courts, such as the Congress must have been aware of when it enacted § 2013.

I would hold that the statute, with its unchallenged regulatory gloss, simply fails to provide for the case before us, much as we might wish it did. I would therefore allow defendant's motion and dismiss the petition.