CAROLINA, CLINCHFIELD & OHIO RAILWAY COMPANY, PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10761–78.     Filed June 4, 1984.

*George K. Dunham*, for the petitioner.
*Stuart B. Kalb*, for the respondent.

WILBUR, *Judge*: Respondent determined the following deficiencies in the Federal income tax of the Carolina, Clinchfield & Ohio Railway Co.:

| | |
|---|---|
| 1972 | $300,276.23 |
| 1973 | 353,140.19 |
| 1974 | 331,341.91 |
| 1975 | 476,515.98 |
| Total | 1,461,274.31 |

The issues for our decision are (1) whether petitioner realized additional income from cancellation of indebtedness in the years at issue; (2) whether petitioner is entitled to claim an investment credit on additions, betterments, and replacements of its track structure made by its lessees; (3) whether petitioner's election to exclude certain items from income under section 108[1] is effective despite being first filed with the amended return, and, if so, whether some portion of the investment credit must be recaptured under section 47; and (4) whether petitioner may claim a deduction in 1975 for amortization of its railroad grading and tunnel bores.

FINDINGS OF FACT

*General*

Some of the facts have been stipulated, and those facts are so found. The stipulations and attached exhibits are incorporated by this reference.

Petitioner Carolina, Clinchfield & Ohio Railway Co. (CC & O) is a corporation that was organized in 1905 under the laws of the Commonwealth of Virginia. It is a common carrier by rail governed by the Interstate Commerce Commission (ICC). The stock of petitioner is publicly held, and is traded on the New York Stock Exchange. Petitioner's assets consist of its

---

[1]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years at issue, unless otherwise noted.

railroad properties and track, all of the stock of the Carolina, Clinchfield & Ohio Railway of South Carolina, and all of the stock of the Holston Land Co.

The petitioner is an accrual basis taxpayer whose headquarters are in New York, N.Y. Corporate income tax returns for tax years ending December 31, 1972 through 1975, were timely filed at the Internal Revenue Service Center in Holtsville, N.Y. An amended return, to which Form 982 "Consent to Adjustment of Basis" was attached, was filed for tax year 1975 in January 1977.

In October 1924, petitioner and its two rail subsidiaries (hereinafter lessor) entered into a lease with the Atlantic Coast Line Railroad Co. and the Louisville & Nashville Railroad Co. (hereinafter lessees).[2] These latter two companies were the co-owners of an unincorporated operating organization referred to as the "Clinchfield Railroad Company."[3]

The lease provided that all of the railroad properties of the petitioner and its subsidiaries were to be leased to the lessees, subject to all outstanding liens and encumbrances, for a period of 999 years. The ICC approved the contract on the condition that the petitioner and its subsidiaries remain an operating unit separate from the lessees.

Long-term leases like the one at issue here were common during the 1920's in the railroad industry, and were often mandated by the ICC. Many railroad companies began as small lines serving one or two towns or cities. Gradually the smaller lines merged, forming larger and larger systems. The ICC realized that these merged lines were far more efficient, but feared that too much amalgamation would be anticompetitive. In order to achieve the dual goals of promoting efficiency through economies of scale, and avoiding monopoly and antitrust problems, the ICC decided to allow companies to enter long-term leases such as the one at issue here. The two

---

[2]The two other parties to the lease are the Carolina, Clinchfield & Ohio Railway of South Carolina and the Clinchfield Northern Railway of Kentucky. The parties stipulated that the Carolina, Clinchfield & Ohio Railway of South Carolina was wholly owned by petitioner. The Clinchfield Northern Railway is referred to as a rail subsidiary, but the only indications of its relationship to the petitioner are statements in the granting clause of the lease that (a) all its properties were leased to the petitioner, and (b) that the petitioner owns all of its outstanding capital stock and mortgage bonds.

[3]The similarity between the name of this operating organization and that of the petitioner/lessor does not reflect any joint ownership or other relationship outside of that created by the lease.

parties could combine their assets, thereby decreasing operational costs, yet because they were required to remain distinct entities, they could be separated relatively easily if joint operation became monopolistic.

The lease at issue here is a "net lease." All of the lessor's railroad assets were leased to the Clinchfield, which was responsible for operating the lines that ran through Kentucky, Tennessee, North Carolina, and part of Virginia. The lessees paid an annual rental of $1,250,000[4] to the CC & O, and were required to pay a sum, not to exceed $12,000 per year, sufficient to cover the annual corporate expenses of the petitioner. The cash rental payments were primarily used to pay dividends to CC & O shareholders. In addition to these rental payments made directly to the lessor, the lessees were required under article first to pay all interest due on petitioner's outstanding bonds and obligations. Article second required them to pay all taxes and assessments on the leased premises and on the lessor or its franchises. Petitioner had no other sources of income, since virtually all of its properties passed to the lessees under the granting clause of the lease.

## Issue 1. Cancellation of Indebtedness

### FINDINGS OF FACT

The lessor had several outstanding obligations when the lease was entered, and the lessees took the property subject to all the liens and encumbrances securing those debts. The lease does not contain any provision requiring the lessees to pay the principal of any of those outstanding obligations, yet the language of article eighth indicates that this was probably intended. First, that article provides that the lessor will deliver new bonds or obligations to the lessees "sufficient to reimburse the lessees * * * for all payments, costs and expenditures of the lessees, paid or made on behalf of [the] lessors, in taking up, paying and discharging the maturing bonds."[5] The parties also agreed that if for any reason the

---

[4] Rental payments were to begin on Jan. 1, 1925. For the period from that date until Dec. 31, 1927, the annual rental was $750,000; from Jan. 1, 1928, until Dec. 31, 1937, the lessees were to pay $1 million per annum; thereafter rent was fixed at $1,250,000.

[5] The lessees were to specify the denomination, interest rate, terms, and security for any bonds issued by the lessor. The lessees were also to specify the kind and class of stock to be issued, but the

lessees paid the principal on the bonds, "such bonds or other obligations shall not be deemed to have been paid or extinguished but shall * * * be deemed to be valid outstanding obligations and secured in all respects by the mortgage, * * * or other agreement, under which the same were issued, and by which they are secured."

In 1965, petitioner's outstanding long-term debt included first mortgage series A bonds totaling $16,884,000. On April 1, 1965, prior to the September 1, 1965, maturity date of the series A bonds, petitioner issued first-mortgage series B, 4½-percent bonds in the principal amount of $16,800,000. The bonds were sold on the market at 98.53 percent of face value; the proceeds were used to retire the outstanding series A bonds. The ICC approved the new issue on the condition that petitioner pay $336,000 annually into a sinking fund. These payments could be made in cash or in series B bonds, valued at the lesser of face value or cost. The trustee was to use any sinking-fund payments made in cash to redeem outstanding series B bonds; any bonds delivered in satisfaction of the requirement were to be canceled and cremated. Under a separate guaranty agreement, also dated April 1, 1965, the lessees agreed to pay principal, premium, and interest on the bonds, and to make the required sinking-fund payments, if petitioner failed to do so.

The lessees made the required sinking-fund payments beginning in 1966. They purchased series B bonds in the market, generally at a discount, and in March of each year, delivered bonds with an aggregate cost of $336,000 to the trustee for cancellation. The lessees sometimes purchased more bonds than were needed to satisfy the sinking-fund payment; the extras were kept in an account and used for future payments.

Both petitioner and lessees viewed the lessees' sinking-fund payments as being made for the petitioner's account. Various entries were made in the books of both parties when the bonds were acquired by the lessees, when they were transferred to the trustee, and when they were canceled. The net effect of these entries vis-à-vis the petitioner/lessor was to decrease the "long-term obligations" account in the full face value of the bonds, to increase the liability account called "Clinchfield

lease provided that any such stock could not participate in dividends declared from money rental paid by the lessees to the Carolina, Clinchfield & Ohio Railway.

Railroad Company, Lessees-Open Account" by the cost of the bonds, and to increase the "miscellaneous income" account by the difference between face value and cost. This latter amount was reported on the petitioner's return as income from cancellation of indebtedness.[6]

The lessees accounted for the sinking-fund payments by decreasing "cash" in an amount equal to the cost of the bonds and by increasing the asset account "Carolina, Clinchfield & Ohio Railway, Carolina, Clinchfield & Ohio Railway of South Carolina, Lessors-Open Account" in like amount.

The lease contains no specific provisions governing repayment of informal debts between the lessor and lessees. Article 20th governs the settlement of accounts at termination of the lease, and provides that the lessees are to return all of the leased property, along with any money or securities that they received from the lessors at the outset. The lessor, in return, is to pay the lessees (1) the fair value of all additions and betterments for which stock, bonds, or other obligations were not issued; (2) the amount expended by the lessees in discharging any bonds, equipment notes, etc.; and (3) the amount of any money paid by the lessees into any sinking fund of the character discussed in the 1922 mortgage. The amounts due from the lessor are limited, however, by this clause:

provided further, however, that the lessors, in making the payment or payments aforesaid, shall not be required to pay an aggregate sum in excess of the then existing fair value of the leased property so returned.

Thus, while the open account will become due at termination of the lease, it is possible that it will never be paid in full.

In the notice of deficiency, respondent determined that the petitioner realized additional taxable income in each of the 4 years in question. He claims that the full face value of the

---

[6]The face amount of the bonds acquired each year, the cost of the bonds, and the amount of gross income reported by the petitioner were as follows during the years at issue:

|  | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|
| Face amount | $434,000 | $557,000 | $530,000 | $227,000 |
| Cost | 291,055 | 378,032 | 333,600 | 133,999 |
| Income | 142,945 | 178,968 | 196,400 | 93,001 |

The indenture required that bonds with an aggregate *cost* of $336,000 be delivered to the trustee each March. We assume that the discrepancy between that figure and the cost used by the petitioner in calculating its cancellation-of-indebtedness income stems from the timing of the bond purchases.

canceled bonds should be returned as income, not merely the difference between face value and cost.[7]

## Issue 1

### OPINION

In this case, we are presented with the Federal tax consequences of various transactions between the lessor and lessees under a 999-year lease. The first issue involves the correct treatment of the purchase of the petitioner/lessor's bonds by the lessees, and the subsequent cancellation by the trustee.

The petitioner/lessor had several outstanding obligations at the outset of the lease, one of which was a series of bonds secured by a mortgage. The 1923 bond issue was replaced in 1965 by first-mortgage series B, 4½-percent bonds. The new indenture required the petitioner to make an annual sinking-fund payment of $336,000 to the trustee, who would use the funds to purchase, and then cancel, some of the outstanding bonds. The lessees were secondarily liable on these bonds pursuant to a guaranty agreement executed contemporaneously with the bond indenture.

Beginning in 1966, the lessees acquired bonds on the market and transferred a set amount of them to the trustee for cancellation, thereby satisfying the sinking-fund requirement. The lessees carried the cost of these bonds on their books as an

---

[7]In the notice of deficiency, respondent determined that petitioner's income should be increased as follows:

|  | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|
| Face value of bonds canceled | $534,000 | $511,000 | $495,000 | $523,000 |
| Bond discount income reported | (142,945) | (178,968) | (196,400) | (93,001) |
| Net increase in income | 391,055 | 332,032 | 298,600 | 429,999 |

Respondent used the face amount of bonds canceled each year to determine petitioner's income, while petitioner used the face amount of bonds acquired in its calculations. See note 6 *supra*. Petitioner's treatment is consistent with its own accounting procedure (income was shown on the books when bonds were acquired by the trustees, not when canceled) but technically is incorrect. Until the bond is actually canceled, petitioner is liable on it, and thus has realized no increase in wealth.

Respondent's treatment is consistent with article eighth of the lease which provides that even if the lessees pay principal on any obligations, those debts will continue to be treated as outstanding. (See p. 891 *supra*.) The purchase by the lessees followed by transfer to the trustee is analogous to a payment of principal, and thus, standing alone, does not give rise to cancellation-of-indebtedness income.

account receivable from the lessor; the petitioner/lessor, in turn, showed a matching account payable. The difference between the face value of the bonds acquired each year and the net amount due the lessees was reported as income from cancellation of indebtedness.

The parties agree that the taxpayer recognizes income to the extent that its overall liabilities were reduced by the lessees' payments. The parties disagree, however, on the size of that reduction. Petitioner contends that because the bond liability was replaced by a liability to the lessees, income is limited to the difference between the two amounts. Respondent contends that the amounts due under the open account with the lessees are not bona fide debts, and thus says that the full value of the canceled bonds must be included in income.

The different positions of the two parties stem from two different characterizations of what occurred here. Petitioner views the transaction as analogous to that of *United States v. Kirby Lumber Co.*, 284 U.S. 1 (1931), where the taxpayer purchased its own bonds at a discount and was required to recognize income to the extent of that discount. Petitioner says the lessees purchased the bonds on its behalf, that they were acting as its agent, and that the new obligation to the lessees is a partial substitute for the old. In essence, we are asked to impute the cost incurred by the lessees to the petitioner/lessor, and to limit realizable income to the difference between the face value of the canceled bonds and the lessees' cost.

Respondent maintains that the cost cannot be attributed to petitioner because the obligation to repay is illusory. He thus views the transaction as within the ambit of *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716 (1929), where the Supreme Court held that discharge of a debt by a third party creates income to the obligor. Respondent also argues that the non-interest-bearing open account cannot be viewed as a substitution for the canceled series B bond indebtedness. While we do not view the open account as illusory, we agree with respondent that on the record before us, petitioner's "substitution-of-indebtedness" theory must be rejected.

First, we do not believe that the lessees' costs should be imputed to the petitioner/lessor. Petitioner offered no evidence of an agreement that the lessees were to act on its behalf, that the lessees had any fiduciary obligations to the

lessor, or that the lessees had power to affect the legal relations of the lessor. There are some of the traditional indicia of an agency relationship. Restatement, Agency 2d, secs. 13–15 (1958). What we see here is a standard lessor-lessee relationship that cannot, without more, serve as a basis for imputing costs to the petitioner.

Second, we find that the new indebtedness to the lessees differs so fundamentally from the original bond obligation that the petitioner may not treat one as a substitute for the other. Income recognized under the principles of either *Kirby Lumber Co.* or *Old Colony Trust Co.* is in one sense a creature of the balance sheet. The taxpayer is deemed to realize income, not because he has received money or property in hand, but because his liabilities have been decreased without an offsetting decrease in his assets. Looking at petitioner's balance sheet here, we find that the steps taken by the lessees allowed the petitioner to recharacterize a portion of its debt load each year: a fixed bond obligation scheduled to mature in 1989 was replaced by an account payable, due only at termination of the lease—nearly 10 centuries later (in the year 2923) or earlier should the parties so agree. The open account obligation, due nearly a millennium from now, carried no fixed interest, was not represented by a note or other formal evidence of indebtedness, and did not require fixed payments.

We believe that the fundamental differences between the two obligations require us to view the sinking-fund payments as consisting of two separate, distinct events. First, the lessees spent $336,000 to purchase the lessor's bonds on the market. They made this purchase on behalf of the lessor and accordingly created an account receivable on their books. This advance from the lessees is a loan, and thus need not be reported as income. *James v. United States*, 366 U.S. 213, 219 (1961). Petitioner did not realize any cancellation-of-indebtedness income at this time. The mere purchase of one's obligations by a third party does not give rise to income since the issuer is still legally liable to meet the terms of the bonds. Cf. *Peter Pan Seafoods, Inc. v. United States*, 417 F.2d 670 (9th Cir. 1969).

The second transaction was the cancellation of the bonds by the trustee. Under the bond indenture, the trustee was obligated to retire bonds with a market value of $336,000 each year. Because the sinking-fund payments were made by

delivery of discounted bonds, the trustee needed merely to cancel them; had the payment been made in cash, the trustee would have gone into the market, itself, spent the money to purchase bonds, then canceled them. The net effect was the same: without any direct payment, the lessor was relieved of all liability on the series B bonds. It therefore must recognize income in the full face value of the retired bonds. Sec. 61(a)(12); *Old Colony Trust Co. v. Commissioner, supra.*

Petitioner would have us view the two events as interrelated, and thus find that the open account was a substitute for the now-extinct bond liability. This "substitution-of-indebtedness" theory has been used in other cases involving the issuance of new obligations upon retirement of older, maturing bonds.[8] In that line of cases, which began with *Great Western Power Co. v. Commissioner,* 297 U.S. 543 (1936), the substituted debt was similar in nature to the old issue.[9] The open account involved here is an entirely different beast. The retired bonds were obligations carrying a fixed rate of interest and a fixed maturity date; they were freely transferable, and the lessor was obligated to any party holding the bond. A formal bond indenture set forth the terms of issuance, interest, and redemption. The open account, by contrast, represents an advance made by the lessees to the petitioner. The bookkeeping entries of the two parties provide the only evidence of the debt. The account carries no interest, nor does it have any fixed maturity date. Absent specific details, repayment is governed by the general provisions of the lease. Under article 20th, the lessor is required to pay—

---

[8]The issue facing the court in the line of cases beginning with *Great Western Power Co. v. Commissioner,* 297 U.S. 543 (1936), was whether to treat the difference between the face value of the new issue and that of the old as current income under *United States v. Kirby Lumber Co.,* 284 U.S. 1 (1931). The other option was to treat it as a premium received on issuance, or as an adjustment in the interest rate, which would be amortized over the life of the bonds. Eustice, "Cancellation of Indebtedness and the Federal Income Tax: A Problem of Creeping Confusion," 14 Tax L. Rev. 225 (1959). By including the difference between the cost of the canceled bonds—i.e., the new liability—and their face value in income, petitioner has conceded this question.

[9]In *Great Western Power Co. v. Commissioner, supra,* the taxpayer substituted general-lien 8-percent bonds for series B bonds, both of which were secured by a mortgage. See also *Virginia Electric & Power Co. v. Early,* 52 F. Supp. 835 (E.D. Va. 1943) (taxpayer's exchange of new bonds for old ones, identical except for form and date of maturity, deemed a substitution of indebtedness); *Commissioner v. Stanley Co.,* 185 F.2d 979 (2d Cir. 1951) (taxpayer who exchanges its bonds pro rata for those of its predecessor company only recognizes income to the extent of the difference between two issues); cf. *Zappo v. Commissioner,* 81 T.C. 77 (1983). See generally Eustice, *supra* note 8.

The amount expended by the lessees * * * under the terms of this indenture, to pay off and discharge the principal of all or any of the bonds * * * for which stock, bonds, or other obligations of the lessors shall not have been issued. * * *

But the amount due is limited:

Provided further, however, that the lessors, in making the payment or payments aforesaid, shall not be required to pay an aggregate sum in excess of the then existing fair value of the leased property so returned.

Thus while the lease contemplates a settlement of accounts at termination, which we note could be as late as the year 2923, it is possible that the debt will never be fully repaid.

On these peculiar facts, we cannot conclude that the petitioner has merely substituted one liability for another. Cf. *Zappo v. Commissioner*, 81 T.C. 77 (1983). Instead, it has incurred a new and far more contingent liability to the lessees, and it has been relieved completely of the outstanding liability on its series B bonds. Because a party must recognize income when a third party discharges its obligations (*Old Colony Trust Co. v. Commissioner, supra*), the petitioner must include the full amount of the discharged bonds in its income.

In so finding, we do not agree with the respondent's contention that the open account was illusory and not a valid debt. The advances made by the lessees to the petitioner are covered by the lease, and we have no reason to doubt its validity or enforceability. The parties, themselves, clearly feel bound by the provisions of the lease, and in fact have sought judicial clarification of certain provisions. Also, in *Atlantic Coast Line Railroad Co. v. Commissioner*, 31 B.T.A. 730 (1934), affd. 81 F.2d 309 (4th Cir. 1936),[10] this Court held that the lessees could not take a deduction properly allocable to the lessor merely because there was a chance that the debts underlying the expense would not be repaid. Likewise, we do not refute petitioner's "substitution-of-indebtedness" theory on the ground that the open account might never be repaid. Instead, we find a valid debt, but find that it cannot be deemed a substitute for the liability because of the fundamental differences between the two obligations.

---

[10]This case also involved the lease at issue here.

## Issue 2. Investment Tax Credit

### FINDINGS OF FACT

The lessees were to manage and operate the leased properties, and to perform all existing contracts and undertakings of the lessor at their own cost and expense. They also agreed to "keep up, maintain, repair and renew the leased property, and all replacements thereof" so that the railroad would remain in good operating order. The lessees were to bear the cost of any repairs or replacements of the leased premises, but title to such replacements was to vest in the lessor.

During the years at issue, the lessees repaired and replaced portions of the existing track structure. They reported the amounts so spent as operating expenses in their annual reports to the ICC[11] and on their Federal income tax returns.[12] These expenses are not reflected on the lessor's books at all.[13]

The lease also empowered the lessees to "make all such additions, betterments, improvements and extensions upon and to the leased property, as the lessees shall deem to be necessary or proper for the best interests of the leased property." The lessees were to provide and pay for any additions or betterments, but were to be "promptly reimbursed

---

[11]David Freedman, manager of income tax for the Family Lines Rail System, testified that "The ICC requires that all of the expenses relating to the leased property be reported on the lessee's ICC accounting forms." These ICC reports were the starting point for preparation of the Federal tax return.

[12]The petitioner and the lessees use the Retirement-Replacement-Betterment (RRB) method of accounting. The key to this system is the assumption that the entire track structure constitutes one asset which has an indeterminate useful life. Gradual exhaustion of the asset is measured, therefore, not by ratable depreciation of the separate items of the track, but rather by assuming that annual expenses for replacements and retirements are a "rough equivalent of what would be a proper depreciation allowance for all the working assets of the company for that year." *Boston & M.R.R. v. Commissioner*, 206 F.2d 617, 619 (1st Cir. 1953).

The mechanics of the RRB method are simple. All assets are carried on the taxpayer's books at their initial cost; no annual adjustments are made. When an item is replaced, the cost, or the cost less salvage value, of the used asset is charged to operating expense and deducted currently. When an asset is retired without replacement, its basis less any salvage value is charged to operating expense. In essence, replacement expenses are a measure of ordinary wear and tear, while retirement expenses measure the obsolescence of the railroad structure.

[13]In a desposition duly admitted into evidence at trial Mr. John K. Wylie, director of income taxes for the Family Lines Rail System, testified that this information was omitted from the lessor's return for purposes of convenience only. He explained that, technically, the replacement expense should be reported as rental income to the lessor, and taken as a rental expense by the lessees. But because the lessor would have an operating expense exactly equal to its income, the net effect on taxable income was zero. Mr. Wylie noted that the petitioner should perhaps switch to the longer, more accurate method so as to clarify its entitlement to the investment tax credit.

by Carolina, Clinchfield and Ohio Railway with either bonds or capital stock, or both, of Carolina, Clinchfield and Ohio Railway, as the lessees shall at the time specify." Any expenditures for which stock or bonds were not issued were to be repaid by the lessor at termination of the lease.[14] Title to any improvements paid for with funds transferred to the lessees at commencement of the term,[15] or with stock, bonds, or other obligations of the lessor, was to vest in the lessor, and those new properties would become part of the leased premises.

The lessees made additions, betterments, and extensions on the lines leased to them and charged the petitioner for them as required by article seventh. The petitioner showed these outlays as capital expenditures on its annual financial statements to the ICC.[16] On its books, petitioner increased the appropriate asset accounts by the cost of the additions, and at year's end also increased the "Clinchfield Railroad Company, Lessees—Open Account" in a like amount.[17] The lessees, in turn, decreased "cash" by the cost of the addition and increased the asset account "Carolina, Clinchfield and Ohio Railway and Carolina, Clinchfield and Ohio Railway of South Carolina, Lessor's—Open Account" in a like amount.

These increases in the petitioner's liability to the lessees were offset by other transactions. First, article 18th empowers the lessees to sell or otherwise dispose of properties as they see fit. The net proceeds from the sale of unencumbered assets go into a fund to be applied to payment for additions, better-

---

[14] As noted in our findings on issue 1, article 20th placed a ceiling on the amount which the lessor would be required to pay upon termination of the lease.

[15] The granting clause of the lease included "All * * * moneys in possession of or on deposit in bank to the credit of the lessors * * * and also all of the net income of the leased property * * * between the 11th day of May, 1923, and the date of delivery of possession of said railroads to the lessees under this lease."

[16] As noted in note 12 supra, the lessor used the RRB method of depreciation. It required capitalization of all new assets which were not replacements of existing parts of the track structure.

[17] The amounts credited to the account entitled "Clinchfield Railroa I Company, Lessees—Open Account" representing the cost of additions and betterments were as follows:

| Year | Amount |
|------|--------|
| 1972 | $645,203 |
| 1973 | 849,013 |
| 1974 | 1,048,919 |
| 1975 | 904,330 |
| Total | 3,447,465 |

ments, and improvements.[18] Second, the lessees are liable to the petitioner for the value of retired assets. Thus, when assets are retired, the petitioner decreases the liability account "Clinchfield Railroad Company, Lessees—Open Account" by the cost of those assets.[19] The lessees deduct the difference between the cost of these retired assets and their salvage value as an operating expense in their reports to the ICC.[20]

During the years at issue, the petitioner's indebtedness under the open account was, therefore, increased by the cost of bonds turned over to the trustee and by the cost of additions and betterments constructed on the leased properties. These increases were offset by the cost of assets retired by the lessees and by the net proceeds received from the sale of any of the leased properties. The balance due to the lessees increased during the years at issue; in 1975 it stood at $23,206,527.52.[21]

---

[18]During the years at issue proceeds received from the sale of property under the lease totaled $46,810. The annual figures were:

| Year | Amount |
|------|--------|
| 1972 | $100 |
| 1973 | 1,540 |
| 1974 | 34,520 |
| 1975 | 10,650 |
| Total | 46,810 |

[19]The retirements debited to "Clinchfield Railroad Company, Lessees—Open Account" by the petitioner were as follows:

| Year | Retirement without replacement | Retirement with replacement |
|------|-------------------------------|----------------------------|
| 1972 | $88,621 | $24,631 |
| 1973 | 43,902 | 24,522 |
| 1974 | 31,879 | - - - |
| 1975 | 127,605 | 7,251 |
| Sub total | 292,007 | 56,404 |
| Total | $348,411 | |

[20]This is standard practice under the RRB method of depreciation, the cost of the retired asset representing a measure of obsolescence. David Freedman, manager of income tax for the Family Lines Rail System—which now owns the lessees—testified at trial that this accounting method and characterization was mandated by the ICC. He noted that technically the net outlay (original cost less salvage value) represents a rental expense of the lessees, rental income to the lessor, and an offsetting operating expense of the lessor. These extra accounting steps were not followed because the ICC required all expenses relating to the leased property to be reported on the lessees' ICC accounting forms.

[21]The petitioner's books reflected the following amounts due to, and from, the lessees:

| Year | Clinchfield open account – balance due to lessees | Balance due from lessees |
|------|--------------------------------------------------|--------------------------|
| 1972 | $19,631,401.92 | $1,371,669.35 |
| 1973 | 20,747,991.43 | 1,372,538.25 |
| 1974 | 22,101,030.69 | 1,403,044.49 |
| 1975 | 23,206,527.52 | 1,413,460.08 |

The petitioner claimed an investment tax credit on its returns for the years 1972, 1973, 1974, and 1975. The property referred to on the "computation of investment credit" forms was tangible personal property or other tangible property used as an integral part of furnishing transportation services; it included both replacement properties and additions and betterments. Petitioner included railroad grading with other assets for which the credit was claimed.[22] Respondent disallowed the credit, contending that because the expenses were borne by the lessees rather than the petitioner, the petitioner was not entitled to any credit. The CC & O has conceded that $67,500 of the $173,073 credit claimed in 1975 was erroneous, but otherwise challenges respondent's determination.

## Issue 2

### OPINION

The second issue for our decision is whether petitioner is entitled to an investment tax credit for replacement property and for additions and betterments (A-B property) constructed on the leased premises by the lessees. The lease provided that the lessees were to repair, replace, and renew parts as necessary to keep the track in good working order; they were not to be reimbursed for these expenses. On both the ICC annual report and its income tax return, the Clinchfield (lessees) showed the costs of replacements as operating expenses, and deducted them currently. The lease also authorized the lessees to make improvements to the leased premises, but the lessor was responsible for these costs. These A-B properties were capitalized on the petitioner's books; their cost was reflected by an increase in the open account liability to the lessees.

---

There is a $50 discrepancy between the 1975 balance due the lessees as shown by petitioner and the balance receivable as shown by the lessees. It has not been accounted for.

[22]The following amounts were expended for grading:

| Year | Amount |
|------|--------|
| 1972 | $114,332 |
| 1973 | 177,726 |
| 1974 | 58,977 |
| 1975 | 481,252 |

Respondent contends that the petitioner has neither title to, nor any bona fide investment in, either the replacement or the A-B properties, and concludes that it is not entitled to an investment tax credit.[23] The petitioner, relying on the terms of the lease, argues that it has title to, and investment in, the properties, that the other requirements of section 38 have been met, and that it is therefore entitled to claim the credit. We agree with respondent that the CC & O may not claim a credit for any of the replacement properties; it may, however, claim some credit for the additions and betterments.

The 7-percent investment tax credit was originally enacted in 1962.[24] The subsidy was designed to encourage capital-intensive industries to expand and modernize their productive assets. H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 411. Only certain assets are eligible for the credit. Called "section 38 property," the category generally includes tangible personal property "with respect to which depreciation (or amortization in lieu of depreciation) is allowable." Sec. 48(a)(1). The credit is calculated on the basis of a taxpayer's "qualified investment" in the asset (sec. 48), defined by section 46(c)(1) as "the applicable percentage of the basis of each new section 38 property" or the "applicable percentage of the cost of each used section 38 property." The controversy here centers not on whether the assets qualify for the credit, but on whether the petitioner/lessor is entitled to claim it.

In *Hanna Barbera Productions, Inc. v. United States*, an unreported case, 39 AFTR 2d 77–1169, 1172, 77–1 USTC par. 9365, at 86,847 (C.D. Cal. 1977), the court wrote that:

In light of the goal of the investment tax credit to encourage private investment in capital assets, the Court finds that the most important factor

---

[23]Respondent also argues that the assets in question are not depreciable in the hands of the petitioner/lessor. This argument can be refuted on two grounds. First, the retirement-replacement-betterment has long been accepted as a method of depreciation. *Chesapeake & Ohio Railway Co. v. Commissioner*, 64 T.C. 352 (1975); cf. sec. 1.48–1(b)(1), Income Tax Regs. ("a deduction for depreciation is allowable if the property is of a character subject to the allowance for depreciation under sec. 167 and the basis * *.* is recovered through a method of depreciation, including * * * the retirement method"). Second, to the extent of petitioner's investment in the A-B assets (p. 905 *infra*), it is entitled to depreciation since it bears the burden of loss due to obsolescence. Sec. 1.167(a)–9, Income Tax Regs.; see, e.g., *North Carolina Midland Railway Co. v. United States*, 143 Ct. Cl. 30, 163 F. Supp. 610 (1958); *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 788 (1980); cf. *Royal St. Louis, Inc. v. United States*, 578 F.2d 1017 (5th Cir. 1978).

[24]The credit was increased to 10 percent of qualified investment by the Tax Reduction Act of 1975, Pub. L. 94–12, (1975), 89 Stat. 26.

in determining ownership of property eligible for a tax credit is the source of the investment capital. * * *[25]

The capital for the A-B properties was initially provided by the lessees, and the parties do not contend otherwise. Our inquiry does not end here, however, for we must determine the effect of petitioner's liability, reflected by the open account, to reimburse the lessees for the cost of the additions and betterments. The calculation base for the credit is the taxpayer's "qualified investment" which is, in turn, computed from his basis in the asset. Basis is, in general, equal to cost (sec. 1012), increased by any liabilities encumbering the property acquired. *Commissioner v. Tufts*, 461 U.S. 300 (1983); *Crane v. Commissioner*, 331 U.S. 1 (1947). Cost means " 'cost to the taxpayer,' even though the property 'may have a cost history quite different from its cost to the taxpayer.' " *United States v. Chicago, Burlington & Quincy R. Co.*, 412 U.S. 401, 409 (1973), citing *Detroit Edison Co. v. Commissioner*, 319 U.S. 98, 101 (1943). Liabilities encumbering the property are not included in basis for depreciation or investment credit if they are highly contingent and unlikely to be repaid. *Denver & Rio Grande Western R.R. Co. v. United States*, 205 Ct. Cl. 597, 505 F.2d 1266 (1974); cf. *CRC Corp. v. Commissioner*, 693 F.2d 281 (3d Cir. 1982), revg. and remanding on other grounds *Brountas v. Commissioner*, 73 T.C. 491 (1979); *Brountas v. Commissioner*, 692 F.2d 152 (1st Cir. 1982), vacating and remanding on other grounds 73 T.C. 491 (1979).

Petitioner has no cost basis whatsoever in the replacement properties. The lessees are solely responsible for replacement costs, as these fall within the obligation to maintain the properties in good working order. The petitioner/lessor carries the cost of the original asset on its books, but this reflects the peculiarities of RRB accounting rather than evidence of

---

[25]See also *Panhandle Eastern Pipe Line Co. v. United States*, 228 Ct. Cl. 113, 654 F.2d 35 (1981). The issue facing the court in that case was whether a basis reduction under sec. 1017 triggered the recapture rules of sec. 1.47–2(c), Income Tax Regs. The court held that it did not, and in the process expressed this view of the investment tax credit:

"The legislative history of the Revenue Act of 1962 * * * shows that the purpose of enacting the investment credit was to stimulate domestic investment by reducing the net cost of acquiring depreciable assets and increasing the flow of cash available for investment. * * * It was intended that the investment credit only be available to taxpayers who actually used the section 38 property in their trade or business, and that the amount of the credit be limited by * * * the actual period during which the taxpayer has funds invested in qualified property. [654 F.2d at 39; citations omitted.]"

capital investment; the mere fact of replacement demonstrates that the initial capital provided by the petitioner has been used up. The expenses, in fact, are not even recorded in petitioner's books.

The CC & O's cost basis in the additions and betterments consists of (1) proceeds from the sale of operating assets and (2) the value of assets retired by the lessees pursuant to the lease. During the years at issue, this totaled $395,221. See notes 19–20 *supra*.

We are not convinced that petitioner's liability under the open account should be included in basis for purposes of the investment credit. Liabilities contingent upon the occurrence of some event, or which, for some other reason, are unlikely to be repaid, may be excluded from basis. *Anderson v. Commissioner*, 446 F.2d 672 (5th Cir. 1971); *Denver & Rio Grande Western R.R. Co. v. United States, supra*; *Lemery v. Commissioner*, 52 T.C. 367 (1969), affd. on other issues 451 F.2d 173 (9th Cir. 1971); *Columbus & Greenville Railway Co. v. Commissioner*, 42 T.C. 834, 847 (1964), affd. per curiam 358 F.2d 294 (5th Cir. 1966). To include such liabilities is to pervert the definition of "cost" in section 1012, and to allow deductions and credits based on liabilities that may never be paid.

In the instant case, the likelihood that the lessor will repay the lessees is minimal. There is no obligation to make current payment of interest, and eventual payment of principal on the open account may not occur (if it occurs at all) for nearly a millennium. Nothing at all is due until the lease is terminated, which could be as late as 2923. The lessees have no incentive to demand earlier payment since the lessor has no source of income. Thus, it is entirely possible that petitioner will not pay one cent on its alleged capital investment in these assets for nearly 10 centuries, if at all. The ceiling set by article 20th may even limit the amount paid at that time. The lessees provided the source of the investment capital, and bear not only the economic risk of the business, but also all of the other benefits and burdens associated with the properties for which the credit is claimed. We believe these factors are inconsistent with ownership, a key factor in determining which of two parties is entitled to the credit. *Hanna Barbera Productions, Inc. v. United States, supra*; cf. *Carnegie Productions, Inc. v. Commissioner*, 59 T.C. 642 (1973).

Our result is also supported by the policy considerations alluded to in *Hanna Barbera Productions, Inc. v. United States, supra*. The goal of section 38 is to encourage investment by reducing the cost of new assets. If the incentive is to work properly, the party making the decision to invest and the actual investment should receive the credit. Here the lessees made the purchasing decisions under article seventh of the lease, and also made the cash outlay. We do not believe that Congress intended that a party such as petitioner, who played no role in decisionmaking, provided no capital up front, and bore no economic risk on the loan, should be able to include the liability in its basis when calculating the credit.

The petitioner insists that the open account is a bona fide debt stemming from a contract negotiated at arm's length, and that the obligation should be so recognized for tax purposes. With some reservations, we agree in general, but this does not help petitioner. The parties, themselves, have already disregarded the language of article seventh by neglecting to issue stocks or bonds to represent the obligation to the lessees vis-à-vis the A-B properties.[26] The lessees' decision to accept the informal open account, and to let it increase over the years without any demand for repayment, indicates a degree of cooperation unusual to arm's-length contracting parties. While we do not agree with respondent that the debt is illusory, close analysis of the parties' relationship convinces us that we must look beyond the formal structure in making our determination. If we were to accept petitioner's position, the incentives of section 38 would certainly not have the desired effect on investment decisions.

Respondent also contends that petitioner is not entitled to any credit for expenses related to construction of railroad grading and tunnel bores, relying on section 185(f).[27] That section states that "Property eligible to be amortized under

---

[26]We note that article seventh requires the lessor to issue "bonds or capital stock, or both" to reimburse the lessees for the costs of additions and betterments. Under article eighth, the lessor is to deliver "new bonds or other obligations or stock, or both" to reimburse the lessees for their expenses in taking up and retiring maturing bonds, equipment notes, etc. The reason for this difference is not obvious, yet it indicates that when the lease was drafted the parties viewed the two types of advances as standing on different footings. The parties clearly failed to make any distinction in practice, however, since both the cost of additions and betterments and of the sinking-fund payments were charged to the open account.

[27]Sec. 185(f) was redesignated as sec. 185(h) effective Oct. 4, 1976. See Pub. L. 94–455, 90 Stat. 1760, 1976–3 C.B. (Vol. 1) 236.

this section shall not be treated as section 38 property within the meaning of section 48(a)." We do not agree. Gradings and bores are not "eligible to be amortized" until the taxpayer has made the election under section 185(c).[28] Petitioner made no such election in 1972, 1973, or 1974, and, therefore, may include costs of grading and bores in calculating the credit to which it is entitled. The CC & O did make an election in 1975 and thus the 1975 expenditures for grading must be excluded. See pp. 914–915 *infra*.

We conclude that petitioner/lessor is not entitled to any investment credit for replacements constructed by the lessees. Petitioner's qualified investment in the additions and betterments is limited to (1) proceeds from assets sold by the lessees, and (2) the value of assets retired by the lessees.

## Issue 3. The Section 108/1017 Election

### FINDINGS OF FACT

The lessees were responsible for preparation of the petitioner's Federal income tax return. Prior to 1972, the work was done in Erwin, Tenn., by Mr. Beales of the Clinchfield Railroad.[29] In 1966 or 1967, John Wylie, director of income taxes for the Family Lines Rail System,[30] told Mr. Beales that the CC & O could elect to defer some of its income from cancellation of indebtedness by using section 108. Mr. Beales seemed interested, and indicated that he would make the election on the following year's return. Mr. Wylie did not check to see if the election had been made as promised. In 1969, he realized that the election had not been made, discussed the matter with Mr. Beales, and again relied upon

---

[28]See also sec. 48(a)(8) which specifically excludes certain classes of amortized property from assets eligible for the investment credit. It is significant that sec. 185 is not mentioned.

[29]From the commencement of the lease until 1972, the lessee Clinchfield Railroad Co., an unincorporated association, was owned by the Atlantic Coast Line Railroad and the Louisville & Nashville Railroad Co. Each corporation only owned 50 percent of the Clinchfield, thus neither could exert control if disagreements arose. The result of this stalemate was that Clinchfield employees often had the final say in controversial matters. The income tax returns, for instance, were not seen by the Atlantic's tax personnel until after they were sent to corporate headquarters in New York for signing and filing.

[30]In November 1972, the Seaboard Coast Line Railroad (the successor corporation to the Atlantic Coast Line Railroad) became the sole owner of the Louisville & Nashville, and, therefore, of the Clinchfield. The Seaboard Coast Line Railroad is, in turn, a wholly owned subsidiary of Seaboard Coast Line Industries, a member of the Family Lines Rail System.

Mr. Beales' statement that he would file the election with the current return.

In 1972, the Family Lines System became the sole owner of the Clinchfield, and soon thereafter all of the tax and accounting personnel moved to Jacksonville, Fla. A Mr. Haines prepared the CC & O return. Technically, Mr. Wylie was his superior, but due to confusion resulting from the move, certain personality conflicts, and the fact that the return had to be signed at CC & O's official headquarters in New York, Mr. Haines did not see the return until after it was filed. Thus, he did not realize that the CC & O had not elected to use section 108 until after the first 1975 return was filed. An amended return containing the Form 982 election was filed on January 7, 1977.

## Issue 3

### OPINION

The third issue for our decision is whether the Commissioner abused his discretion in refusing to accept the section 1017 election filed with petitioner's amended 1975 return. Petitioner maintains that it has shown reasonable cause for the delayed election, and that the Commissioner is therefore required to accept it under section 1.108(a)–2, Income Tax Regs. The respondent, however, asserts that there was no reasonable cause for the delayed filing, and that petitioner does not qualify for section 108 treatment in 1975. We agree with petitioner.

Section 108 allows a corporate taxpayer to exclude discharge of indebtedness income from gross income if the taxpayer "makes and files a consent to the regulations prescribed under section 1017."[31] Sec. 108(a)(2). Section 1017 requires that

---

[31]Sec. 108(a), as in effect in 1975, read as follows:

SEC. 108. INCOME FROM DISCHARGE OF INDEBTEDNESS.

(a) SPECIAL RULE OF EXCLUSION.—No amount shall be included in gross income by reason of the discharge, in whole or in part, within the taxable year, of any indebtedness for which the taxpayer is liable, or subject to which the taxpayer holds property, if—

(1) the indebtedness was incurred or assumed—

(A) by a corporation, or

(B) by an individual in connection with property used in his trade or business, and

(2) such taxpayer makes and files a consent to the regulations prescribed under section 1017 (relating to adjustment of basis) then in effect at such time and in such manner as the Secretary

amounts so excluded be applied to reduce the basis of property held by the taxpayer during the year in which the discharge occurred. The procedure for making an election is set out in section 1.108(a)–2, Income Tax Regs.[32] Generally, the consent to reduction of basis must be filed with the initial return. However the regulations permit a late election if the taxpayer shows reasonable cause for the delay.

Section 108 is the successor to section 22(b)(9) of the Internal Revenue Code of 1939. The regulations promulgated under that provision required a taxpayer to file the election with the original return. In *Denman Tire & Rubber Co. v. Commissioner*, 192 F.2d 261 (6th Cir. 1951), affg. 14 T.C. 706 (1950), the Sixth Circuit refused to recognize the effect of a consent first filed with an amended return. Soon thereafter the Code was amended, with the following explanation:

> Section 304 of your committee's bill makes a technical amendment to section 22(b)(9) to allow for greater flexibility as to the time for filing the required consent to a reduction of basis. Under the present law, the taxpayer must file its consent with its return for the taxable year. * * * Under this amendment, the Department could continue to require that the consent be filed with the return in the ordinary case, but might make provision for filing of the consent at a later date in appropriate hardship cases. [S. Rept. 781, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 458, 500.]

In *Columbia Gas System, Inc. v. United States*, 473 F.2d 1244 (2d Cir. 1973), one issue was whether the Commissioner had abused his discretion in rejecting an election filed after a

---

or his delegate by regulations prescribes.

The statute was amended in 1980 to include rules governing the tax treatment of debt discharge in bankruptcy and to modify the rules regarding which assets of a solvent debtor would be eligible for a reduction in basis. S. Rept. 96–1035 (126 Cong. Rec.) (1980).

[32]Sec. 1.108(a)–2, Income Tax Regs., reads as follows:

Sec. 1.108(a)-2. Making and filing of consent.

In order to take advantage of the exclusion from gross income provided by section 108(a), a taxpayer must file with his return for the taxable year a consent to have the basis of his property adjusted in accordance with the regulations prescribed under section 1017 which are in effect at the time of filing such return. See sections 1.1017–1 and 1.1017–2. In special cases, however, where the taxpayer establishes to the satisfaction of the Commissioner reasonable cause for failure to file the necessary consent with his original return, he may file the consent with an amended return or claim for credit or refund; and in such cases, the consent shall be to the regulations which, at the time of filing the consent, are applicable to the taxable year for which such consent is filed. In all cases the consent shall be made by or on behalf of the taxpayer on Form 982 in accordance with these regulations and the instructions on the form or issued therewith.

deficiency was asserted. Admitting that this was a close case,[33] the Second Circuit upheld the Commissioner.[34] The reasons behind that result were clarified in *Magill v. Commissioner*, 70 T.C. 465 (1978), affd. 651 F.2d 1233 (6th Cir. 1981), where this Court wrote that:

> In view of the legislative delegation of authority to promulgate regulations on making and filing a consent under section 108, the issue is narrowed to whether the Commissioner has abused the broad discretion granted him by rejecting petitioner's delinquent consent. * * * [*Magill v. Commissioner*, 70 T.C. at 474.]

Thus our task is not to decide anew whether the petitioner has shown reasonable cause for its delayed filing, but rather to determine whether the Commissioner's decision not to accept it constituted an abuse of discretion. We believe that it was.

Neither the statute, nor the regulations, nor the cases offer much guidance in defining reasonable cause. Petitioner argues that the circumstances surrounding preparation of the 1975 return were unusual, and says that they constitute reasonable cause for the delayed filing. We agree that the shift in ownership, changes in responsibility, relocation of accounting personnel, and personality conflicts combined to make preparation of the CC & O return confused and difficult. Even the respondent concedes in his reply brief that the facts in this case are unusual. We believe that in this particular situation, the Commissioner abused his discretion by ignoring Congress' mandate—implemented in the regulations—that the filing requirements be treated flexibly in hardship cases. Petitioner's 1975 election to defer recognition of the income from discharge of indebtedness by reducing basis under section 1017 is therefore valid.

The respondent contends that our conclusion that petitioner's election is valid calls section 47 into play, requiring petitioner to recapture a portion of the investment credit

---

[33]In *Columbia Gas System, Inc. v. United States*, 473 F.2d 1244 (2d Cir. 1973), the taxpayer did not report cancellation-of-indebtedness income upon conversion of certain debentures, relying on a provision of the indenture. On audit, the Commissioner determined that income was realized and asserted a deficiency. Columbia paid the assessment, then filed claims for a refund together with a sec. 1017 consent. The District Director denied the refund claim and rejected the election.

[34]Judge Mansfield, one of three judges on the panel, dissented. He believed that the taxpayer's predicament constituted a special case where there was reasonable cause for the delayed filing. He felt that the Commissioner's refusal was arbitrary and unreasonable, thus an abuse of discretion. *Columbia Gas System, Inc. v. United States, supra* at 1252 (Mansfield, J., dissenting).

claimed in 1975. Petitioner argues that the recapture provisions are not applicable to a basis reduction under section 1017. We agree with petitioner.

Section 47, designed to prevent abuse of the investment credit, requires taxpayers to recapture a portion of the credit taken in a prior year if the property is not used for the full period used in computing the credit. *Panhandle Eastern Pipe Line Co. v. United States*, 228 Ct. Cl. 113, 654 F.2d 35 (1981); B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 27.4 (1981). The amount included in income is the excess of the credit first allowed over the credit that would have been allowed had it been calculated on the basis of the period of time the asset was actually used in the specified manner. Sec. 1.47–1(a), Income Tax Regs.; B. Bittker, *supra*. The recapture rules are triggered when an asset is "disposed of, or otherwise ceases to be section 38 property." Sec. 47(a). There was no disposition in the instant case, thus the issue is whether a reduction in basis pursuant to section 1017 is a cessation within the intendment of section 47.

Respondent relies on section 1.47–2(c), Income Tax Regs., in support of his affirmative answer. That section provides that if—

the basis (or cost) of section 38 property is reduced, for example, as a result of a refund of part of the cost of the property, then such section 38 property shall be treated as having ceased to be section 38 property * * * to the extent of the amount of such reduction in basis.[35]

We believe that this regulation, when read in the context of the statute, other regulations, and the general policy behind recapture, does not include basis adjustments made under section 1017.

The term "cessation" is never defined, but the regulations offer the following guidelines for determining when one has occurred:

Sec. 1.47–2. "Disposition" and "cessation".—
(a) *General rule*—* * *
(2) *"Cessation"*. (i) A determination of whether section 38 property ceases to be section 38 property with respect to the taxpayer must be made for each taxable year subsequent to the credit year. Thus, in each such taxable year

---

[35]Respondent's position is also expressed in two revenue rulings: Rev. Rul. 72–248, 1972–1 C.B. 16, and Rev. Rul. 74–184, 1974–1 C.B. 8.

the taxpayer must determine, as if such property were placed in service in such taxable year, whether such property would qualify as section 38 property (within the meaning of section 1.48–1) in the hands of the taxpayer for such taxable year.

This first part of the regulation clearly contemplates some change in the property or its use which would render it ineligible for the credit.[36] An adjustment to the cost basis (sec. 1012) because of a reduction in the purchase price, for example, is analogous: the taxpayer no longer has a "qualified investment" (sec. 48) to the extent of that decrease, and this renders the property ineligible for the credit. Section 1.47-2(c), Income Tax Regs., clearly applies to that situation.

The regulations also provide that:

(ii) Section 38 property does not cease to be section 38 property with respect to the taxpayer in any taxable year subsequent to the credit year merely because under the taxpayer's depreciation practice no deduction for depreciation with respect to such property is allowable to the taxpayer for the taxable year, provided that the property continues to be used in the taxpayer's trade or business (or in the production of income) and otherwise qualifies as section 38 property with respect to the taxpayer. [Sec. 1.47–2(a)(2)(ii), Income Tax Regs.]

Thus, even if the adjusted basis for determining gain or loss (sec. 1011) is zero, the asset remains "section 38 property" so long as it has the same useful life and the same role in the taxpayer's trade or business. Comparing the two rules, it is plain that the crucial inquiries are whether the asset continues to qualify as section 38 property and whether the cost remains a "qualified investment." Only when some change occurs is there a cessation which triggers recapture. Adjustments under section 1011 are not within the scope of section 1.47–2(c), Income Tax Regs., therefore, because they affect neither the asset in question nor the qualified investment, but only the amount of gain to be recognized at disposition.

A distinction is made in the Code between the section 1012 cost basis of an asset and the section 1011 adjusted basis for determining gain or loss on a sale or other dispositions. Some transactions or expenditures will affect only the section 1012

---

[36]The first example given in this section of the regulations refers to an individual who converts an asset from business to personal use, thereby removing it from the sec. 38 category. Sec. 1.47–2(a)(2)(iii).

basis, some only the section 1011 basis. Section 1.47–2(c), Income Tax Regs., refers, we believe, only to adjustments in a taxpayer's cost basis.

Adjustments made pursuant to an election under section 108 relate to the adjusted basis for determining gain or loss under section 1011, not to section 1012 cost basis. The rule of section 108 allowing deferral of discharge of indebtedness income was designed to ease the impact of debt restructuring. Rather than recognizing income in the year of discharge, a taxpayer reduces the basis of some asset, putting off recognition until the asset is sold. B. Bittker, *supra* at par. 6.4.7. Neither the cost of the asset, its use in the taxpayer's trade or business, or its actual useful life vis-à-vis the taxpayer is affected by this adjustment; it relates solely to the basis for determining gain or loss when the asset is sold. Furthermore, section 1.1011–1, Income Tax Regs., provides that "the adjusted basis for determining the gain or loss * * * is the cost or other basis prescribed in section 1012 * * * adjusted to the extent provided in sections 1016, 1017, and 1018." Thus it is clear that only the adjusted basis for determining gain, and not the cost basis, is affected by section 1017.

Our conclusions that section 1.47–2(c), Income Tax Regs., relates only to adjustments to cost basis, and that the section 1017 adjustment is to the basis for determining gain or loss, lead us to decide that section 1.47–2(c), Income Tax Regs., is not applicable to section 1017 basis reductions. This result is supported by the policies underlying the recapture rules of section 47 and the deferral rules of section 1017. The petitioner/lessor's basis in certain assets was reduced because of transactions and provisions wholly unrelated to the investment credit. The assets qualifying for the credit were no different in 1975 when the section 1017 election was made than they were in prior years. There was no change in cost, in useful life, or in their role in the business. We cannot conclude that Congress intended the recapture provisions to apply to this situation. Also, if we interpret the regulation as respondent suggests, the goal of sections 108 and 1017 will be thwarted: petitioner will be forced to recognize income and pay tax in the current year as a result of its discharge of indebtedness. Section 108 was designed to alleviate this problem, and we refuse to stand in the way of that goal.

We conclude, therefore, as has the Court of Claims in *Panhandle Eastern Pipe Line Co. v. United States*, 228 Ct. Cl. 113, 654 F.2d 35 (1981), that petitioner's reduction of basis under section 1017 does not trigger recapture.

### *Issue 4. Section 185 Amortization*

#### FINDINGS OF FACT

Petitioner filed an amended return for the taxable year 1975 on January 7, 1977. This return included a deduction for amortization of railroad grading and tunnel bores[37] as permitted by section 185. Attached to that return was a schedule which contained the following information:

| Description of property | Cost | Amortization period | 1975 amortization |
|---|---|---|---|
| Account 3— railroad grading | $17,043,757.09 | 50 yrs. | $340,875.14 |
| Account 5— tunnel bores | 5,756,104.93 | 50 yrs. | 115,122.10 |
| | 22,799,862.02 | | 455,997.24 |

This was the only information submitted by petitioner concerning the grading and bores. We have no exact description of the properties, nor do we know whether original use commenced before or after December 31, 1968.

Gradings and bores with a cost basis of $11,657,514 were transferred, with the other railroad assets, to the lessees at the beginning of the lease. Between 1925 and 1975 an additional $5,757,405 was expended for grading.[38] These costs were

---

[37]Railroad grading provides the foundation for the track structure. The cost is the cost of moving one cubic yard of earth—either a "cut" which involves removal of excess soil, or a "fill," which builds up the track structure. A tunnel bore is the "horizontal passageway that is made through a hill or mountain in order to accommodate the placement of a roadbed through the same." *Burlington Northern Inc. v. United States*, 230 Ct. Cl. 102, 676 F.2d 566, 568 (1982). Sec. 185(f)(1) describes grading and tunnel bores collectively as improvements resulting from "excavations (including tunneling), construction of embankments, clearings, diversions of roads and streams, sodding of slopes, and * * * similar work necessary to provide, construct, reconstruct, alter, protect, improve, replace, or restore a roadbed or right-of-way for railroad track."

[38]The grading expenses are broken down as follows:

| | |
|---|---|
| Expenditures as of 1/1/25 | $11,657,514 |
| Additions thereto from 1925–75 per books of CC & O | 5,109,839 |
| Additions thereto from 1925–75 per records of CC & O of South Carolina | 647,566 |
| Subtotal | 17,414,919 |

recorded on the books of either the Carolina, Clinchfield & Ohio Railway or the Carolina, Clinchfield & Ohio Railway of South Carolina. We do not know which party paid for these assets.

## Issue 4

### OPINION

The final issue for our decision is whether petitioner is entitled to a deduction in 1975 for amortization of all of its railroad grading and tunnel bores under section 185. Respondent contends that the election, first filed with the amended return, was both untimely and defective. Alternatively, he argues that petitioner has no basis in the subject properties. Petitioner says that in light of the 1976 amendments to section 185, only one election needs to be made, and contends that that election is covered by Temporary Regs., 26 C.F.R. sec. 7.0(b)(2) (1977), rather than by section 1.185–3(b), Income Tax Regs. Petitioner argues that, at the very least, the deduction should be allowed for the pre-1969 grading.

Section 185 was added to the Code in 1969. Prior to that time, railroads were generally not allowed to depreciate or amortize the cost of their gradings or tunnel bores because the useful life could not be determined with any certainty.[39] In 1969, the Senate recommended that railroads be allowed to amortize these costs using a 50-year average life. S. Rept 91-552 (1969), 1969–3 C.B. 423, 584. The Conference Committee retained the basic provision, but decided to limit amortization to "such property the original use of which commences after December 31, 1968." Conf. Rept. 91–782 (1969), 1969–3 C.B. 644, 674; sec. 185(f)(2).

Regulations governing amortization were promulgated in 1971. They provide that an election to amortize should be

Less: Retirements 1925–75 ................................................ ($371,162)
Account 3—railroad grading................................................ 17,043,757

The petitioner concedes that if the investment tax credit is allowed for grading costs for 1975, then $481,252 was erroneously included in the amortization base.

[39]Although this was the general rule, taxpayers able to establish a useful life as required by sec. 167 were entitled to depreciate their grading and tunnel bores. This was difficult to do because with proper maintenance, grading and bores are usually not subject to physical exhaustion. *Burlington Northern Inc. v. United States, supra* at 568; *Kansas City Southern Railway v. Commissioner*, 76 T.C. 1067, 1152 (1981), on appeal (8th Cir., Oct. 25, 1982).

made with the first return; it may be made by amended return "only if such amended return is filed no later than the time prescribed by law * * * for filing the return." Sec. 1.185–3(a), Income Tax Regs.[40] The election is to include, inter alia, a description of the property and a statement of when original use commenced. Sec. 1.185–3(a), Income Tax Regs.

In 1976, Congress decided to extend the amortization provision to grading and tunnel bores placed in service prior to 1969.[41] The new rule provides that "A taxpayer may * * * elect * * * to treat the term 'qualified railroad grading and tunnel bores' as including pre-1969 railroad grading and tunnel bores." Sec. 185(d). The temporary regulation governing an election under section 185(d) maintains the general rule of section 1.185–3, Income Tax Regs., requiring that elections be made with the original return.[42] A limited exception is

---

[40]Sec. 1.185–3, Income Tax Regs., reads as follows:

Sec. 1.185–3. Time and manner of making and terminating elections.

(a) *Election of amortization—(1) Initial election.* Under section 185(c), an election by the taxpayer to take the amortization deduction provided in section 185(a) shall be made on a statement attached to its income tax return filed for any taxable year beginning after December 31, 1969 during which year the taxpayer has qualified railroad grading or tunnel bores which are eligible for such deduction (see paragraph (a)(2)(i) of section 1.185–1). If the taxpayer does not file a timely return (taking into account extension of the time for filing) for the taxable year for which the election is first to be made, the election shall be filed at the time the taxpayer files his first return for that year. The election may be made with an amended return only if such amended return is filed no later than the time prescribed by law (including extensions thereof) for filing the return for the taxable year of election. If an election is not made within the time and in the manner prescribed in this paragraph, no election may be made (by the filing of an amended return or in any other manner) with respect to such taxable year. * * *

[41]The legislative history offers this rationale for its amendment:

"In the intervening period [1969–76], Congress has studied the desirability of extending amortization to past investments in railroad property. The basic issue of allowing amortization of this otherwise nondepreciable property was resolved in the 1969 Act, and fair valuation of property placed in service in the past has been reached for the vast majority of grading and tunnel bores by the Interstate Commerce Commission and counterpart State regulatory bodies. As a result, Congress believes it is now appropriate to extend the 50-year amortization to railroad grading and tunnel bores placed in service before 1969."

Staff of Joint Comm. on Taxation, Summary of the Tax Reform Act of 1976, at 463–464 (Comm. Print 1976), 1976–3 C.B. (Vol. 2) 475–476.

[42]The pertinent provisions of Temporary Regs. sec. 7.0 are as follows:

Sec. 7.0 Various elections under the Tax Reform Act of 1976.

(a) *Elections covered by temporary rules.*

| | * * * * * * * | |
|---|---|---|
| Section | Description of election | Availability of election |
| | * * * * * * * | |

made for taxpayers who filed returns for years ending before December 31, 1976, by January 1, 1977: they may make the election in an amended filing. 26 C.F.R. sec. 7.0(b)(2) (1977), Temporary Regs. This exception was necessary because section 185(d), enacted in 1976, was made retroactive to tax years beginning after December 31, 1974.

Resolution of the present controversy depends upon our interpretation of section 185(d). Petitioner contends that because the clear intent of the 1976 Act "was to place both sets of grading on the same basis," an election under section 185(d) covers assets placed in service before and after 1969. From that premise, petitioner concludes that Temporary Regs. section 7.0 governs all amortization elections. Respondent argues that section 185(d) and Temporary Regs. section 7.0 only apply to amortization of pre-1969 assets.

We agree with petitioner's basic premise that the purpose of the 1976 amendment was to make amortization available for all railroad grading and tunnel bores, and to abolish the distinction between pre- and post-1969 grading.[43] But we cannot agree with its conclusion. Both the permanent and temporary regulations require that the election be made within the time prescribed for filing an original return. A

---

| | (2) *Second Category* | |
|---|---|---|
| 185(d) of Code | Amortization of railroad grading and tunnel bores. | All taxable years beginning after December 31, 1974 |

*    *    *    *    *    *    *

(b) *Time for making election or serving notice*—* * *

(2) *Category (2).* A taxpayer may make an election under any section referred to in paragraph (a)(2) for the first taxable year for which the election is allowed or for the taxable year selected by the taxpayer when the choice of the taxable year is optional. The election must be made (i) for any taxable year ending before December 31, 1976, for which a return has been filed before January 31, 1977, by filing an amended return, provided that the period of limitation for filing claim for credit or refund of overpayment of tax, determined from the time the return was filed, has not expired or (ii) for all other years by filing the income tax return for the year for which the election is made not later than the time, including extensions thereof, prescribed by law for filing income tax returns for such year.

[43] At first blush, this conclusion seems contradicted by the structure of sec. 185. Subsec. (a) gives the general rule allowing amortization of "qualified railroad grading and tunnel bores." That term is defined in sec. 185(f)(2) as property "the original use of which commences after December 31, 1968," yet subsec. (d) states that taxpayers may elect to treat that term as including pre-1969 assets. Thus the distinction between pre- and post-1969 grading is maintained. We see two possible explanations. First, Congress set out special rules for determining the adjusted basis of pre-1969 assets, and thereby ensured that some line would be drawn. Second, the bifurcated structure adopted by Congress simplified the mechanics of the retroactivity provision. These technical considerations do not change our interpretation of the basic thrust of the amendments.

single exception is made for taxable years ending before December 31, 1976 (such as the year 1975 before us), for which original returns were filed before January 31, 1977. Without this exception, Congress' desire to make the provision retroactive would have been frustrated. We believe that the exception should not be extended beyond where it is needed, however, and thus hold that an election in an amended return will only be effective for pre-1969 grading and bores. This construction of the statute and regulation enables petitioner to benefit from the 1976 change without allowing it to avoid the general rule prohibiting elections from being made in an amended return. Petitioner's election was, therefore, not timely as to properties placed in service after 1969, but is timely for pre-1969 assets.

The next question is whether the election was defective because petitioner failed to provide the information required by section 1.185–3, Income Tax Regs. Respondent contends that this regulation applies to pre-1969 assets even though it was promulgated before amortization was extended in 1976. We do not agree. First, the information required by section 1.185–3(a)(i) and (ii), Income Tax Regs., seems designed to assist the Commissioner in ensuring that deductions are taken only for post-1969 property. That information is unnecessary now that amortization has been extended to all grading and bores. Second, section 185(e), also added by the Revenue Act of 1976, sets out the means for determining the adjusted basis of pre-1969 property in some detail; the information necessary to that calculation is quite different from that required by section 1.185–3(a), Income Tax Regs. It seems likely, therefore, that if the Commissioner needs specific facts, he will promulgate regulations requiring them. Third, in the temporary regulation covering section 185(d), no reference is made to the requirements of section 1.185–3, Income Tax Regs. Subsection (f) of that regulation states that if permanent regulations requiring more information are promulgated in the future, an electing taxpayer will be required to submit that data. This clearly indicates that the temporary regulation was not intended to incorporate the rules of section 1.185–3, Income Tax Regs.

Petitioner's election is, therefore, neither untimely nor defective vis-à-vis pre-1969 properties. Thus, if the other requirements of the section have been met, petitioner may

take the deduction it has claimed. Petitioner bears the burden of proof on this issue. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933).

As with depreciation, a taxpayer must have both a capital investment in, and suffer economic loss on, properties for which he claims a deduction for amortization. *Atlantic Coast Line Railroad Co. v. Commissioner*, 31 B.T.A. 730 (1934), affd. 81 F.2d 309 (4th Cir. 1936), cert. denied 298 U.S. 691 (1936).[44] In the instant case, the parties have stipulated that petitioner transferred grading with a cost basis of $11,657,514 to the lessee at commencement of the lease; petitioner thus has the required capital investment in those assets. It also bears the burden of loss due to exhaustion, wear and tear, and obsolescence. *North Carolina Midland Railway Co. v. United States*, 143 Ct. Cl. 30, 163 F. Supp. 610 (1958). Thus, petitioner may claim amortization with respect to those properties.

As to railroad grading and tunnel bores constructed after 1925, the doubts we expressed at issue 2, *supra*, concerning petitioner's capital investment in properties added to the line after commencement of the lease also plague us here. Petitioner has offered virtually no evidence showing that it paid for these gradings and bores, and we therefore cannot find that it has the requisite investment in these assets.

*Decision will be entered under Rule 155.*

---

[44]The cited case refers to the requirements for depreciation rather than for amortization. Generally, the two terms refer to the same process of writing off the cost of an asset over time. Certain conventions determine which term will be used and when. B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 23.1.1 (1981).